**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

TAMA LYNN DUNCAN,

       Plaintiff,

v.                                        CV 13-459 WPL

CAROLYN W. COLVIN, *Acting Commissioner of the Social Security Administration*,

       Defendant.

**MEMORANDUM OPINION AND ORDER**

Tama Duncan filed an application for Disability Insurance Benefits and Supplemental Security Income on October 21, 2009. (Administrative Record ("AR") 12.) She alleges disability beginning August 6, 2009, due to joint and muscle pain, bone pain, a stomach ulcer, and chronic diarrhea. (AR 106, 110.) Administrative Law Judge ("ALJ") W. Thomas Bundy held a disability hearing on October 4, 2011. (AR 21-30.) On October 17, 2011, the ALJ determined that Duncan was not under a disability as defined by the Social Security Act and was therefore not entitled to benefits. (AR 9-20.) Duncan filed an appeal with the Appeals Council, but the Council declined her request, making the ALJ's decision the final decision of the Social Security Administration ("SSA"). (AR 1-5.)

Duncan sought review of the SSA's decision (Doc. 1) and filed an opposed Motion to Reverse or Remand Administrative Agency Decision (Doc. 17) and supporting Memorandum (Doc. 18). The Commissioner of the SSA ("Commissioner") responded (Doc. 19), and Duncan filed a reply (Doc. 20). After having read and considered the entire record and the relevant law, I

grant Duncan's motion and remand this case to the SSA for proceedings consistent with this opinion.

## STANDARD OF REVIEW

In reviewing the ALJ's decision, I must determine whether it is supported by substantial evidence in the record and whether the correct legal standards were applied. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004) (citation omitted). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009) (quoting *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007)). A decision is not based on substantial evidence if other evidence in the record overwhelms it or if there is only a scintilla of evidence supporting it. *Hamlin*, 365 F.3d at 1214 (quotation omitted). However, substantial evidence does not require a preponderance of evidence. *U.S. Cellular Tel. of Greater Tulsa, L.L.C. v. City of Broken Arrow, Okla.*, 340 F.3d 1122, 1133 (10th Cir. 2003). I must meticulously examine the record, but I may neither reweigh the evidence nor substitute my discretion for that of the Commissioner. *See Hamlin*, 365 F.3d at 1214 (quotation omitted). I may reverse and remand if the ALJ has failed "to apply the correct legal standards, or to show us that []he has done so." *Winfrey v. Chater*, 92 F.3d 1017, 1019 (10th Cir. 1996).

## SEQUENTIAL EVALUATION PROCESS

The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2014). At the first three steps, the ALJ considers the claimant's current work activity, the medical severity of the claimant's impairments, and the requirements of the Listing of Impairments. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4), & Pt. 404, Subpt. P, App'x 1. If a

claimant's impairments are not equal to one of those in the Listing of Impairments, then the ALJ proceeds to the first of three phases of step four and determines the claimant's residual functional capacity ("RFC"). *See Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996); 20 C.F.R. §§ 404.1520(e), 416.920(e). The ALJ then determines the physical and mental demands of the claimant's past relevant work in phase two of the fourth step and, in the third phase, compares the claimant's RFC with the functional requirements of her past relevant work to see if the claimant is still capable of performing her past work. *See Winfrey*, 92 F.3d at 1023; 20 C.F.R. §§ 404.1520(f), 416.920(f). If a claimant is not prevented from performing her past work, then she is not disabled. *Id.* The claimant bears the burden of proof on the question of disability for the first four steps, and then the burden of proof shifts to the Commissioner at step five. *See Bowen v. Yuckert*, 482 U.S. 137, 146 (1987); *Talbot v. Heckler*, 814 F.2d 1456, 1460 (10th Cir. 1987). If the claimant cannot return to her past work, then the Commissioner bears the burden, at the fifth step, of showing that the claimant is capable of performing other jobs existing in significant numbers in the national economy. *See Thomas*, 540 U.S. at 24-25; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

## FACTUAL BACKGROUND

Duncan is a forty-two-year-old woman with a tenth-grade education. (AR 93, 114.) Duncan worked eleven of the years between 1989 and 2009, primarily as a waitress, but also as a Certified Nursing Assistant from August 2007 to March 2008. (AR 102, 161.)

The first medical record in the AR is dated August 2, 2007. On that date, radiologist M.S. Vidyasagar, M.D., M.B.A., found that Duncan's hands were both normal, though Dr. Vidyasagar noted that Duncan had a history of joint pain. (AR 199.)

3

On February 6, 2008, Duncan went to the Ben Archer Health Center ("Ben Archer") for an exam following a January 14, 2008, appendectomy. (AR 183.) She was permitted to return to work on February 14, 2008, with the restriction that she could lift no more than fifteen pounds. (*Id.*) Duncan returned to Ben Archer on February 12, 2008, for a left elbow sprain, upon catching her left arm in a chair. (*Id.*)

On February 22, 2008, radiologist Kevin McDonnell, M.D., took multiple x-ray views of Duncan's right foot due to her complaints of right great toe pain. (AR 196.) Dr. McDonnell found degenerative changes at the first metatarsal phalangeal articulation, mild hallux valgus deformity, and spur formation at the insertion of the Achilles tendon. (*Id.*)

Duncan returned to Ben Archer on February 28, 2008, complaining of foot pain caused by an injury to her right foot at work on February 21, 2008. (AR 181.) The provider found that Duncan had a right foot contusion and recommended ice, foot elevation, and naproxen as needed for pain. (*Id.*)

Duncan visited Ben Archer on April 21, May 16, October 29, and November 4, 2008, for skin tags, onychomycosis, and a pelvic and breast exam. (AR 177-80.) On November 17, 2008, she had a mammogram and ultrasound due to a lump in the left breast, but the tests showed no evidence of malignancy. (AR 194-95.)

On January 7, 2009, Duncan went to Ben Archer, complaining of migraine headaches. (AR 176.) Duncan stated that she had previously been on migraine medication but could not remember which one. (*Id.*) The provider prescribed Maxalt and recommended that Duncan stay in a dark room and use a cold compress when she has a migraine. (*Id.*)

On June 11, 2009, Duncan visited Ben Archer, complaining of a stomachache. (AR 175.) On October 1, 2009, Duncan returned, with complaints of allergies and joint and "limb pain" in

her arms, legs, and hands that had been ongoing for months. (AR 174.) Duncan stated that she

had to quit her job because of the pain. (*Id.*) The provider assessed Duncan with joint pain, noted

that her mother has rheumatoid arthritis, and recommended over-the-counter Claritin as needed.

(*Id.*)

Duncan went to Ben Archer again on October 19, 2009, complaining that she continued

to have joint aches and pains. (AR 173.) Duncan felt tired, but not depressed. (*Id.*) The provider

assessed her with myalgias and noted that Duncan was in a new relationship, causing some

increased stress in her life. (*Id.*)

Duncan returned to Ben Archer on December 21, 2009, complaining of worsening joint

pain. (AR 203.) Duncan stated that she could not keep a job because of the pain. (*Id.*) The

provider assessed her with myalgias and depression, continuing Duncan on tramadol for pain and

starting her on venlafaxine. (*Id.*) The provider also referred Duncan to rheumatology. (*Id.*)

Duncan completed a Function Report on January 7, 2010. (AR 116-23.) Duncan stated

that she lives with her two daughters and boyfriend. (AR 116.) She can stand to do part of the

dishes, but her older daughter finishes them because she cannot stand long and her joints hurt.

(*Id.*) She can sweep or mop in stages or have someone finish these chores for her. (*Id.*) She

cannot lift anything heavy. (*Id.*) Due to severe joint pain, she lies down frequently. (*Id.*) Duncan

stated that she cannot dress as quickly because of joint pain, her older daughter does her hair, and

shaving and using the toilet also take longer. (AR 117.) Duncan can feed her pets, but someone

else gives them water because she cannot lift the water bowl. (*Id.*) She can prepare meals, which

take a couple of hours with help. (AR 118.) She cannot clean, do laundry, iron, mow the lawn, or

perform household repairs. (*Id.*) When Duncan leaves the house, she normally rides in the car,

rather than driving herself. (AR 119.) She goes shopping once a month for about three hours.

(*Id.*) She does no lifting because she drops things. (AR 121.) Squatting, bending, sitting, and kneeling hurt Duncan's joints, and she cannot walk far or go upstairs. (*Id.*)

On February 13, 2010, Carlos Pastrana, M.D., conducted a Disability Determination Examination of Duncan. (AR 205-07.) Duncan informed Dr. Pastrana that she had pain for several years, starting in the elbows and going down the forearms and into the hands, and now also in her knees, hips, low back, feet, and toes. (AR 205.) Duncan reported that her pains are usually mild, but worsen with walking, moving her arms, or cold weather. (*Id.*) Duncan's children perform most of the household chores because of the pain. (*Id.*) Duncan also stated that she has had three to four watery stools per day since her gallbladder was removed in 1994. (*Id.*)

Duncan reported to Dr. Pastrana that she last worked in August 2008 as a server. (*Id.*) Duncan can dress and feed herself. (*Id.*) She told Dr. Pastrana that she can stand for ten minutes at a time and a total of two hours in an eight-hour period; sit for fifteen minutes at a time and a total of six hours in an eight-hour period; walk on level ground for one block; lift twenty pounds; drive for fifteen minutes; and, with help, perform household chores such as sweeping, mopping, vacuuming, cooking, and washing dishes. (*Id.*)

Dr. Pastrana found Duncan to be "highly obese" and in no acute distress. (AR 206.) Duncan "ambulated well and got on and off the examination table and up and out of a chair without difficulty." (*Id.*) Duncan's

> [g]ait was good without cane, crutch, or assistive device. Grip was good in both hands. . . . Range of motion was full in all extremities and cervical spine. She had pain with movement of the neck. The lumbar spine had forward flexion of 60 degrees with low back pain and lateral flexion 20 degrees to both sides. There is tenderness to palpating the distal one third of the feet. She has 11 positive trigger points out of the 18 used by the American College of Rheumatology for the diagnosis of fibromyalgia. . . . She walked on heels without problems. She was unable to walk on toes. She squatted half way to the floor and recovered.

(AR 207.) Dr. Pastrana found that Duncan has "1) chronic pain most likely due to fibromyalgia. She has difficulty doing household chores because of the pain[,] 2) chronic pain in the feet most likely due to osteoarthritis[,] 3) history of stomach ulcer apparently healed[, and] 4) history of chronic diarrhea, etiology not determined." (*Id.*)

On February 24, 2010, Elva Montoya, M.D., a state agency, non-examining physician, performed a Case Analysis. (AR 208.) Dr. Montoya found that while Duncan's alleged functional limitations are not internally inconsistent with the evidence in the file, the severity of her alleged limitations is not supported by the evidence. (*Id.*) Dr. Montoya concluded that Duncan's conditions cause no more than a slight limitation in her ability to perform work-related functions and are considered non-severe. (*Id.*) N.D. Nickerson, M.D., affirmed this opinion in a second Case Analysis on July 15, 2010. (AR 209.)

Duncan completed a second Function Report on April 19, 2010. (AR 127-34.) Duncan stated that on a normal day, she gets up at 5:00 a.m. to cook breakfast. (AR 127.) She rests from making breakfast and then takes most of the day to wash the dishes, unless her daughter does them for her. (*Id.*) Duncan can typically sweep the hallway. (*Id.*) She is usually in bed because she cannot bear to be on her feet. (*Id.*) Duncan's daughters cover all pet care now. (*Id.*) Duncan helps with dinner, but cannot peel or cut anything. (AR 129.) She can lift about five pounds and walk about a block before needing to rest for ten to fifteen minutes. (AR 132.)

On June 10, 2010, x-rays taken of Duncan's elbow due to pain showed normal bones, joints, and soft tissue, with no evidence of fracture, dislocation, or subluxation. (AR 222.) On July 16, 2010, Duncan visited Ben Archer, complaining of increased pain in her lower back that was starting to radiate to the shoulders. (AR 210.) She also had joint pain in her ankles, feet, knees, elbows, hips, shoulders, and neck. (*Id.*) Duncan rated her pain as 9/10, and she was

fatigued. (*Id.*) Duncan tested positive for pain in all eighteen fibromyalgia trigger points. (*Id.*) Duncan had a neurology appointment scheduled for the next day. (*Id.*)

Duncan returned to Ben Archer on August 30, 2010, for falling twice and for swollen feet, ankles, and legs. (AR 220.) She also complained of new onset of numbness and tingling in the tips of her fingers. (*Id.*) On September 1, 2010, Duncan complained of numbness and tingling in both feet and stated that she falls all the time. (AR 219.) She missed her neurology appointment. (*Id.*) Duncan was assessed with possible fibromyalgia, polyarticular joint pain, and low extremity weakness. (*Id.*) The provider advised her to obtain a new neurology appointment as soon as possible and referred her to rheumatology. (*Id.*)

On September 13, 2010, Duncan went to Ben Archer for left knee pain. (AR 218.) She hurt her knee bowling a week prior. (*Id.*) Duncan continued to complain of chronic pain and feet numbness. (*Id.*) The provider assessed her with myalgia, left knee pain, and chronic pain. (*Id.*) The provider recommended ice, elevation, and ibuprofen for the knee and encouraged Duncan to go to rheumatology. (*Id.*) On October 8, 2010, Duncan had an MRI of the left knee. (AR 213.) There was no evidence of ligamentous injury, and findings were most consistent with a Baker's cyst/bursitis. (*Id.*)

### HEARING TESTIMONY

The ALJ held a hearing on October 4, 2011, at which Duncan and a Vocational Expert ("VE") testified. (AR 21-30.) Duncan was represented by an attorney. (*Id.*)

Duncan testified that the last time she worked was as a waitress in August 2009. (AR 23.) She chose to leave after two days because she kept dropping things. (AR 24.) Since then, Duncan has not applied for workers' compensation or unemployment benefits, and she has not

looked for work. (*Id.*) Duncan lives with her boyfriend and children, and she receives child support. (*Id.*)

Duncan testified that her health has gradually gotten worse, and she is doing a "great deal worse" than in 2009. (*Id.*) She is on Medicaid and sees Catherine Horton, PA-C, at Ben Archer. (AR 24-25.) Duncan testified that she is on pain medication, that she cannot hold onto anything, and that she cannot walk. (AR 25.)

The ALJ asked the VE the exertional and skill level for a waitress. (*Id.*) The VE testified that such work is light semiskilled, with a Specific Vocational Preparation ("SVP") rating of four. (*Id.*)

Duncan testified that she sleeps a lot during the day. (*Id.*) She has a driver's license, but has trouble driving due to medications that make her sleepy. (*Id.*) She drove herself to the hearing, but had not driven for a few months prior. (AR 25-26.) Duncan's daughter normally drives her places. (AR 26.)

Duncan complained of fibromyalgia and excruciating pain from tendonitis in her feet. (*Id.*) She is not on her feet for more than five or ten minutes before her body hurts, she has to take pain medication, and she lies down to sleep. (*Id.*) Duncan testified that she lies down every day, for most of the day. (*Id.*)

Duncan also complained of migraine headaches. (AR 27.) She has a couple of migraines per week, and they usually last all day. (*Id.*) Duncan throws up when she has migraines and has to stay in a dark, cold room. (*Id.*)

Duncan testified that she has had chronic diarrhea and Irritable Bowel Syndrome for eighteen years, after she had her gallbladder removed. (*Id.*) Duncan has had ten surgeries since

1994, including two breast surgeries, two hernia surgeries, gallbladder removal, and a partial hysterectomy. (*Id.*)

Duncan also has problems sitting; her entire left side goes numb. (AR 27-28.) Sometimes her lips go numb as well. (AR 28.) Duncan testified that a doctor told her that she needed to have a nerve test done because she might have Guillain-Barré Syndrome ("GBS").[1] (*Id.*) She confirmed that her doctor told her to go to a rheumatologist and a neurologist. (*Id.*) Duncan testified that she went to have a nerve test conducted, but she discovered that she no longer had insurance. (*Id.*) She has not seen either a rheumatologist or a neurologist. (*Id.*)

Each day, it takes a while for Duncan to get up, and she normally takes pain medication in the morning. (AR 28-29.) The pain medication helps her move a little better, but she is still up for no more than five or ten minutes at a time. (AR 29.) She usually takes pain medication twice a day. (*Id.*) She falls asleep within thirty to forty-five minutes of taking medication. (*Id.*) Further, Duncan testified that she has been dropping things for the past two years. (*Id.*)

## THE ALJ AND APPEALS COUNCIL'S DECISIONS

The ALJ reviewed Duncan's application for benefits according to the sequential evaluation process. (AR 9-20.) At the first step, the ALJ found that Duncan had not engaged in substantial gainful activity since August 6, 2009, the alleged onset date. (AR 14.) Then, at the second step, the ALJ concluded that Duncan suffers from the severe impairments of fibromyalgia

---

[1] Guillain-Barré syndrome (GBS) is a disorder in which the body's immune system attacks part of the peripheral nervous system. The first symptoms of this disorder include varying degrees of weakness or tingling sensations in the legs. In many instances the symmetrical weakness and abnormal sensations spread to the arms and upper body. These symptoms can increase in intensity until certain muscles cannot be used at all and, when severe, the person is almost totally paralyzed.

*Guillaine-Barré Syndrome Fact Sheet*, NAT'L INST. OF NEUROLOGICAL DISORDERS & STROKE (Jan. 22, 2015), http://www.ninds.nih.gov/disorders/gbs/detail_gbs.htm#184633139.

and obesity. (*Id.*) At step three, the ALJ found that Duncan's combination of severe impairments did not equal one of the listed impairments. (AR 14-15.)

The ALJ then determined Duncan's RFC, finding that Duncan can lift or carry twenty pounds occasionally and ten pounds frequently, stand or walk for six hours in an eight-hour workday, and sit for two hours in an eight-hour workday. (AR 15.)

The ALJ acknowledged Duncan's testimony that she has pain in her feet, cannot walk or stand for extended periods, and suffers from migraines, chronic diarrhea, and left-sided numbness. (*Id.*) The ALJ found that Duncan's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but that Duncan's statements regarding the intensity, persistence, and limiting effects of the symptoms are not credible to the extent they are inconsistent with the RFC. (*Id.*)

The ALJ noted that Duncan has eighteen trigger points for fibromyalgia; that she is on tramadol, Cymbalta, and amitriptyline; that x-rays of her left elbow were unremarkable; and that an MRI of her left knee in October 2010 was consistent with Baker's cyst/bursitis, but not ligamentous injury. (AR 15-16.)

The ALJ noted the findings of Dr. Pastrana, including that Duncan is highly obese; her gait was good without a cane, crutch, or assistive device; she had full range of motion in all extremities and in the cervical spine; she had pain with neck movement and tenderness to palpation of the distal one third of the feet; she had eleven of eighteen positive trigger points for fibromyalgia; and supine and sitting straight leg raise tests were negative bilaterally. (AR 16.)

The ALJ found that Duncan's daily activities were not limited to the extent one would expect, given her complaints of disabling symptoms. (*Id.*) The ALJ noted that Duncan could

dress, bathe, feed herself, use the bathroom without assistance, prepare meals, sweep, and shop in stores. (*Id.*)

The ALJ concluded at step four that Duncan could perform past relevant work as a waitress. (*Id.*) The ALJ stated that Duncan's past work required a light exertional level, which is consistent with her RFC. (*Id.*) Further, the ALJ clarified that Duncan can perform her past relevant work as actually and generally performed. (*Id.*) As the ALJ determined that Duncan could perform her past relevant work, the ALJ concluded that Duncan was not disabled. (AR 16-17.)

Duncan appealed the decision to the Appeals Council, but the Council found that Duncan's reasons for disagreeing with the hearing outcome did not provide a basis for changing the ALJ's decision, thereby rendering the ALJ's decision the final decision of the Commissioner. (AR 1-2.)

DISCUSSION

Duncan claims that the ALJ erred on three bases: 1) that the ALJ's credibility assessment was not based on substantial evidence, 2) that the ALJ erred in his discussion of Duncan's past relevant work, and 3) that the ALJ committed legal error in failing to develop the record by ordering a consultative exam to assess whether Duncan has GBS.

**I.      Credibility Assessment Not Based on Substantial Evidence**

Duncan asserts that the ALJ did not fully credit her statements regarding the limiting effects of her pain and diarrhea. Duncan cites *Luna v. Bowen* for the Tenth Circuit's three-phase process for evaluating disabling pain. 834 F.2d 161, 163 (10th Cir. 1987). In the first phase, the ALJ must determine whether objective medical evidence demonstrates a pain-producing impairment. *Id.* Objective evidence can include both physiological and psychological medical

evidence. *Id.* at 162. In the second phase, the ALJ must ascertain whether there is at least a loose nexus between the demonstrated impairment and the pain alleged by the claimant. *Id.* at 163-64. Finally, at the third stage, the ALJ must consider all of the evidence to decide whether the claimant's alleged pain is disabling. *Id.* at 163.

Duncan argues that at the third phase of the analysis, the ALJ provided an incorrect description of Duncan's daily activities in determining that her complaints were not credible to the extent that they were inconsistent with the RFC. Duncan notes that the ALJ stated that she "indicated that she could dress, bathe, feed herself and use the bathroom without assistance. She is also able to prepare meals, sweep and shop in stores." (AR 16.) Duncan contends that this description of her daily activities is incorrect and incomplete; Duncan actually alleges quite limited daily activities. Duncan argues that the ALJ violated Social Security Ruling ("SSR") 96-7p, 1996 WL 374186 (July 2, 1996),[2] by failing to provide specific reasons for his credibility finding that are supported by evidence in the AR. Accordingly, Duncan argues that the ALJ's credibility assessment is not supported by substantial evidence.

The Commissioner responds that the ALJ is not required to recite all of the evidence, but instead must only point to the specific evidence relied on to assess the claimant's credibility. The Commissioner then highlights evidence from the AR to support the RFC, concluding that the ALJ based his credibility finding on "the medical evidence, objective test findings, including a normal x-ray of the elbow, conservative treatment, her ability to treat her impairments with

---

[2] SSRs are binding on the SSA, and while they do not have the force of law, courts traditionally defer to SSRs since they constitute the agency's interpretation of its own regulations and foundational statutes. *See Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990); 20 C.F.R. § 402.35; *see also Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993) (SSRs entitled to deference).

medication, and her daily activities." (Doc. 19 at 7.) As such, the Commissioner insists that the ALJ's credibility determination is based on substantial evidence.

Duncan replies that the ALJ never discussed in his credibility analysis conservative treatment or Duncan's ability to treat her impairments with medication. Such reasoning by the Commissioner constitutes, Duncan argues, improper post-hoc rationalization for the ALJ's decision.

Despite the Commissioner's post-hoc arguments in support of the ALJ's decision, the ALJ himself must reference those parts of the AR that support his conclusions. *Krauser v. Astrue*, 638 F.3d 1324, 1331 (10th Cir. 2011) (citing *Hamlin*, 365 F.3d at 1217). In his decision, the ALJ only discusses Duncan's activities of daily living; her medical treatment history, generally; and her medical signs and findings, such as an unremarkable x-ray of her left elbow and an MRI of her left knee that was consistent only with a Baker's cyst/bursitis. (*See* AR 16.) Only Duncan's daily activities are included in the sole paragraph specifically discussing Duncan's credibility. (*See id.*)

In assessing the claimant's credibility, the ALJ is required to "consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." SSR 96-7p, 1996 WL 374186, at *1. "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear . . . the weight the adjudicator gave to the individual's statements and the reasons for that weight. *Id.* at *2.

In *Krauser*, the court remanded the case because the ALJ incorrectly discussed Krauser's daily activities and such discussion was a significant part of the ALJ's credibility assessment. 638 F.3d at 1332-33. The ALJ wrote that, on a daily basis, Krauser watched television, did yard work, helped with housework, and did his own laundry. *Id.* at 1332. In reality, Krauser had stated that he did yard work only once every week or two for ten to fifteen minutes, that he did not sweep floors, cook, or pick up things off the floor, that he could put dishes in the dishwasher, make a bed halfway, and exercise for only four or five minutes at a time. *Id.* at 1332-33. The court determined that Krauser's daily activities were "more consistent with his claims of significant physical limitation than with the ALJ's conclusion that he is capable of full-time work at the medium exertional level." *Id.* at 1333.

In the present case, Duncan provided in a Function Report that she cannot dress, shave, or use the toilet as quickly because of joint pain. (AR 117.) She cannot clean, do laundry, iron, mow the lawn, or perform household repairs. (AR 118.) Duncan's daughters complete all pet care. (AR 127.) Meals take a couple of hours to prepare, and that is with assistance. (AR 118.) Duncan cooks breakfast and helps with dinner, but cannot cut or peel anything. (AR 129.) She can sweep the floor in stages, or she has someone finish the chore for her. (AR 116.) It takes Duncan most of the day to wash the dishes; she can only be on her feet for five to ten minutes at a time, and then she must lie down. (AR 127, 132.) Duncan spends most of her day lying down. (AR 132.) She has a couple of migraine headaches per week, lasting most of the day and forcing her to lie down in a cold, dark room. (AR 27.)

As in *Krauser*, Duncan's reported daily activities are more consistent with her claims of disabling pain than with the ALJ's RFC. The ALJ's brief mention of the unremarkable x-ray of Duncan's left elbow and the MRI of her left knee, consistent with a Baker's cyst/bursitis, does

15

not solve the problem that a significant portion of the ALJ's reasoning for discounting Duncan's credibility is not supported by the evidence in the AR. On remand, the ALJ shall correctly represent Duncan's statements about her daily activities, while considering the entire case record, in order to reassess his credibility determination.

## II.    Discussion of Past Relevant Work

Duncan notes in this section of her motion to remand her argument that the ALJ's RFC finding is not supported by substantial evidence. I have already addressed the ALJ's assessment of Duncan's credibility, which may result in a different RFC upon remand. Therefore, I proceed to the next part of Duncan's argument, also from step four of the sequential evaluation process. Duncan contends that the ALJ erred by failing to make specific findings as to the demands of her past work. That is, while the ALJ stated that waitressing is semi-skilled, light work, the ALJ did not discuss any function or duty required for a job as a waitress. Duncan argues that the ALJ erred by not asking the VE questions about waitressing beyond requesting the skill level. Further, Duncan argues that even if the ALJ compared in his head Duncan's RFC with the functions required of a waitress, he erred by not writing down his specific findings.

The Commissioner responds that the ALJ did not err because he considered the record as a whole, including Duncan's own Disability Report, which included Duncan's description of the way she actually performed past relevant work as a waitress. The Commissioner contends that the ALJ was permitted to find that Duncan could perform past work as she actually performed it, and the record available allowed the ALJ to make such an assessment.

Duncan replies that the ALJ did not provide an analysis or reasons for why Duncan can perform past work as she actually performed it and that the Commissioner's argument is improper post-hoc rationalization.

16

After the ALJ has made an RFC finding, the next phase of step four of the sequential evaluation process is to "make findings regarding the physical and mental demands of the claimant's past work." *Winfrey*, 92 F.3d at 1024 (citation omitted). "To make the necessary findings, the ALJ must obtain adequate 'factual information about those work demands which have a bearing on the medically established limitations.'" *Id.* (quoting SSR 82-62, 1982 WL 31386, at *3 (Jan. 1, 1982)). This information may come from the claimant, an employer, or another informed source. SSR 82-62, 1982 WL 31386, at *3.

In *Sissom v. Colvin*, the court remanded the case because the ALJ failed to "develop the record with 'factual information' regarding the actual work demands of [claimant's past relevant work]." 512 F. App'x 762, 769 (10th Cir. 2013) (unpublished) (quoting *Winfrey*, 92 F.3d at 1024). The ALJ in *Sissom* learned from the VE the exertional and skill levels of the claimant's past relevant work and included that information—and only that information—in the decision with regard to the demands of claimant's past relevant work. *Id.* at 768-69. Yet the ALJ previously found that the claimant had certain postural limitations and moderate mental limitations. *Id.* at 769. The ALJ failed to examine the postural and mental demands of the claimant's past relevant work. *See id.*

In *Villalobos v. Colvin*, the ALJ stated 1) that the VE testified that the claimant could perform his past relevant work and 2) that the claimant could perform his past relevant work as generally performed. 544 F. App'x 793, 797 (10th Cir. 2013) (unpublished). The court found that "the [ALJ] also had to make findings on a narrower subject: the physical and mental demands of the past jobs. The [ALJ] failed to make these findings, and the omission constitutes error." *Id.* The court remanded the case and instructed the ALJ to make findings on the demands of the

claimant's past relevant work and reassess the claimant's ability to perform such work. *Id.* at 797-98.

In the present case, the ALJ stated that in comparing Duncan's RFC with the physical and mental demands of waitressing, Duncan is able to perform the work as actually and generally performed. (AR 16.) The ALJ noted that Duncan's past relevant work as a waitress requires a light exertional level, and such level does not exceed her RFC. (*Id.*) While Duncan's RFC includes lifting, standing/walking, and sitting limitations, the ALJ did not obtain and discuss factual information about the physical demands of waitressing. The Commissioner may not make post-hoc arguments about what the ALJ considered in reaching his conclusions. *See Krauser*, 638 F.3d at 1331. Even if the ALJ had used the Disability Report cited by the Commissioner to determine how Duncan actually performed her past relevant work as a waitress, the Disability Report information conflicts with the RFC. (*See* AR 111.) For example, Duncan provided in the Disability Report that she stood or walked for seven hours a day as a waitress. (*Id.*) Duncan's RFC, however, limits her to standing/walking for six hours in an eight-hour workday. (AR 15.) Further, Duncan stated in the Disability Report that she lifted up to thirty-five pounds as a waitress. (AR 111.) Duncan's RFC limits her to lifting twenty pounds occasionally. (AR 15.)

I therefore find that the ALJ's decision violates *Winfrey* and SSR 82-62. Upon remand, the ALJ must obtain and discuss factual information about the physical demands of waitressing as the job was actually performed or as it is generally performed in the national economy. *See Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d 1045, 1051 (10th Cir. 1993); SSR 82-61, 1982 WL 31387, at *2 (Jan. 1, 1982) ("[I]f the claimant cannot perform the excessive functional demands and/or job duties actually required in the former job but can perform the functional demands and job duties as generally required by employers throughout the economy, the

claimant should be found to be 'not disabled.'"). The ALJ must then compare again Duncan's RFC with the functional requirements of her past relevant work.

### III.    Ordering a Consultative Exam

Duncan argues that the ALJ erred in failing to order a consultative examination to address whether she has GBS. Prior to the hearing, Duncan's attorney submitted a letter to the ALJ noting that Duncan reported that she was referred to a neurologist for a nerve conduction test and to a rheumatologist, but that insurance would not pay for these visits. (Doc. 18 at 14; AR 166.) Duncan's attorney wrote that the ALJ "may wish to order a neurology and rheumatology consultative examination." (AR 166.) Duncan also testified at the hearing that her providers thought that she had GBS because of recurring numbness in the left part of her body. (Doc. 18 at 15; AR 28.) She testified, however, that she no longer had insurance to cover the visits. (AR 28.) Duncan argues that the record established a reasonable possibility that she was functionally disabled because of GBS and that, therefore, the ALJ should have ordered a consultative examination. Because the ALJ did not do so, Duncan argues, the ALJ failed in his duty to develop the record.

The Commissioner cites to *Krauser*, 638 F.3d at 1327, countering that Duncan's "isolated references" to referrals did not suggest a reasonable possibility of an impairment and therefore did not trigger the ALJ's duty to further develop the record. (Doc. 19 at 9.) Further, the Commissioner points out that no medical reports explicitly reflect that a doctor stated that Duncan might have GBS.

While the claimant has the burden of demonstrating that she is entitled to benefits, a social security disability hearing is nevertheless a nonadversarial proceeding. *Madrid v. Barnhart*, 447 F.3d 788, 790 (10th Cir. 2006).  Therefore, "[t]he ALJ has a basic obligation in

every social security case to ensure that an adequate record is developed during the disability hearing consistent with the issues raised." *Henrie v. U.S. Dep't of Health & Human Servs.*, 13 F.3d 359, 360-61 (10th Cir. 1993); *see Madrid*, 447 F.3d at 790. "'[T]he ALJ should order a consultative exam when evidence in the record establishes a *reasonable possibility* of the existence of a disability and the result of the consultative exam could reasonably be expected to be of material assistance in resolving the issue of disability.'" *Madrid*, 447 F.3d at 791 (quoting *Hawkins v. Chater,* 113 F.3d 1162, 1169 (10th Cir. 1997)) (emphasis in original). The claimant must raise the issue to be developed, and it must be substantial on its face. *Hawkins*, 113 F.3d at 1167. Further, "where additional tests are required to explain a diagnosis already in the record, [such as] 'Painful Upper Limbs,' 'resort to a consultative examination may be necessary.'" *Madrid*, 447 F.3d at 791 (quoting *Hawkins*, 113 F.3d at 1166).

In *Krauser*, cited by the Commissioner, the court found no duty to order a consultative examination for depression where there was no medical testing, diagnosis, or treatment of anything related to depression, and the record included only a couple of deeply buried "passing references" to depression. 638 F.3d at 1327. Such is not the case here. Instead of the possibility that Duncan has GBS being deeply buried in the record, Duncan's attorney brought the matter directly to the ALJ's attention through a pre-hearing letter by noting GBS by name and suggesting that the ALJ order a consultative examination, and Duncan herself specifically testified that she might have GBS but that she did not have insurance to pay for the testing. (AR 28, 166.) There are references from three visits in the medical record to Duncan's need for a neurology appointment. (AR 218-220.) There are also references from three visits in the medical record to Duncan's need for a rheumatology appointment. (AR 203, 218-19.) Numbness is mentioned five times in the record, and tingling is mentioned four times. (AR 144, 148, 218, 219,

220.) Additional tests are required to explain the numbness and tingling. The evidence in the records, combined with Duncan's former attorney's suggestion that the ALJ order a consultative examination and Duncan's own testimony that she was unable to pay to see the specialists her providers recommended, reflect a reasonable possibility of a disability, and the result of a consultative exam could reasonably be expected to be of material assistance in resolving the issue of disability. *See Madrid*, 447 F.3d at 791. As such, the ALJ erred in failing to further develop the record. On remand, the ALJ shall order a consultative examination to assess whether Duncan has GBS.

## CONCLUSION

I conclude that the ALJ erred in three respects to be addressed on remand. First, the ALJ erred in his credibility analysis of Duncan; on remand, the ALJ shall correctly represent Duncan's statements about her daily activities, while considering the entire case record, in order to reassess his credibility determination. Second, the ALJ erred in failing to discuss the specific physical demands of Duncan's past relevant work; on remand, the ALJ shall obtain and discuss factual information about the physical demands of waitressing as Duncan actually performed the job or as it is generally performed in the national economy. Third, the ALJ erred in failing to develop the record; on remand, the ALJ shall order a consultative examination to assess whether Duncan has GBS. Accordingly, I grant the motion to remand and remand this case to the SSA for further proceedings consistent with this opinion.

IT IS SO ORDERED.

_William P. Lynch_
William P. Lynch
United States Magistrate Judge

21

A true copy of this order was served
on the date of entry--via mail or electronic
means--to counsel of record and any pro se
party as they are shown on the Court's docket.